#30777-aff in pt & rev in pt-SPM
**2025 S.D. 44**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

KYLEA WAGNER,                                    Petitioner and Appellee,

    v.

RIGO TOVAR,                                      Respondent and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ERIC KELDERMAN
Judge

* * * *

JARED D. NOONEY of
Nooney & Solay, LLP
Rapid City, South Dakota                  Attorneys for respondent and
                                          appellant.


GEORGE J. NELSON
Rapid City, South Dakota                  Attorney for petitioner and
                                          appellee.

* * * *

CONSIDERED ON BRIEFS
MARCH 24, 2025
OPINION FILED **08/06/25**

#30777

MYREN, Justice

[¶1.] Kylea Wagner filed a petition for a protection order against Rigo Tovar for herself and their two minor children. Following a permanent order hearing, the circuit court found that domestic abuse occurred and issued a five-year domestic permanent protection order that required Rigo not to have any contact with Kylea and their two children. Rigo filed a motion to modify the protection order, which the circuit court denied following a hearing. Rigo appeals. We affirm in part and reverse in part.

## Factual and Procedural Background

[¶2.] Kylea and Rigo began a significant romantic relationship in 2013 and have two children together: I.T. (ten years old) and T.T. (nine years old). In May 2024, Kylea filed a petition for a protection order against Rigo for herself and the two children. The petition alleged that on or about May 22, 2024, Rigo's actions inflicted Kylea and her children with fear that Rigo was about to cause them physical harm or bodily injury. Her petition included a "Summary of Incidents" describing certain events that occurred on December 30, 2023, January 8, 2024, January 14, 2024, February 8, 2024, and May 22, 2024. In the petition, Kylea also noted that she and Rigo had separated in February 2024 and that custody litigation had been initiated. In her request for relief, Kylea asked that Rigo receive supervised visitation with the children. The circuit court issued an ex parte temporary protection order and set the matter for a permanent order hearing. The temporary order authorized Rigo to have supervised visitation at United Families.

-1-

[¶3.]    At that permanent order hearing, Kylea testified that in the first year of their relationship, Rigo became angry during an argument, pushed her into their laundry room, and "pinned [her] back with his forearm against [her] neck." She described a similar incident that occurred about a year later, where Rigo pinned her against the bed, causing her to have difficulty breathing.

[¶4.]    Kylea then testified that, on December 30, 2023, she and the children came home from a basketball tournament and found "Rigo sitting in his chair in the living room drinking Fireball shooters and beer." After an argument, Kylea watched Rigo go into a room that contained his gun safe. While in that room, Kylea "witnessed Rigo . . . opening a box of a sight laser to be mounted onto an AR-15." Kylea was worried that Rigo might hurt her or the children.

[¶5.]    Kylea testified that on January 14, 2024, while getting her children ready for basketball practice:

> I asked Rigo if he was going to make it home on time to go to practice. He came in – he pulled into the driveway and we – the kids and I were putting our shoes on and a red laser came from his truck through the front door onto my son's chest, [T.T.]'s chest first. I grabbed [T.T.] and moved him to the wall. I got closer to the door and window and to try to make eye contact with Rigo and assess the situation. I was frozen and scared. I didn't know what to do, other than I seen in the reflection of the window where the laser was on my chest and slowly moved onto my forehead, and I just stood there in fear of not knowing what to do. . . . We proceeded to walk out of the house and Rigo made it as if it was a joke and I was overreacting.

Kylea testified that she "did not see the firearm" because Rigo's truck windows were tinted, but she did see the laser coming through the front window.

[¶6.]    When confronted with a photo of a laser pointer in a drawer from her house, Kylea testified, "This was a new item that was in the house. I've never seen

this prior." She denied any knowledge that her children had a laser pointer. A picture of a Smith & Wesson pistol, like one owned by Rigo, was admitted into evidence. Kylea testified that there was a laser clipped to the bottom of Rigo's pistol.

[¶7.]      Kylea testified that on the morning of May 22, 2024, she met Rigo and the children at the park for a "bike to school day." Rigo and T.T. rode their bikes to school, but I.T. was upset and stayed with Kylea. I.T. and Kylea were still in the park when Rigo returned. Kylea described what occurred in her testimony:

> When he came – when Rigo came back, he loaded up the bicycles; he got in his truck. He started driving away from the park. At this time he stopped really fast; he got out of his truck and started approaching me and [I.T.] in the parking – or in the park itself, not in the parking lot. . . . I was scared. He was coming at me with a very aggressive, fast walk trying to demand our son to leave me. . . . All I did was express, *Please leave us alone. Get back into your truck. Leave us alone. You're scaring me.* He kept coming closer so I kept screaming louder.

(Italics in original.)

[¶8.]      When asked about Rigo's behavior around the children, Kylea explained:

> [H]e has hit the kids. He belittles the children. He makes them feel insecure about themselves. He uses them as a tool against adults. He doesn't show up for their well-being. . . . He punishes them by yelling at them or putting them in a room. I have witnessed him hit [I.T.]. And he hit them with a belt when they were younger.

[¶9.]      In his testimony, Rigo began by explaining the December 30, 2023, incident. He said that when he left the basketball tournament, he "got two Fireball shots" and "a six-pack of beer." When he arrived home, he drank one of the Fireball shots and went to the back room to "put a battery in this [R]ed [D]ot, not a laser, a

-3-

Red Dot scope that is on that AR-15[.]" Rigo asserted that he did not bring the gun out in front of the children and "never pointed a gun at anybody."

[¶10.]     As to the January 14, 2024, incident, Rigo testified that the only lasers he knew about were the laser pointers he bought for his sons. Rigo denied ever pointing a laser pointer at Kylea or the children during this incident. Rigo testified that the laser pointer in the drawer was "the same kind of laser pointer [he] had in [his] possession in the truck." Rigo noted that this type of laser pointer was not intended to be mounted to a firearm. Rigo also testified that he had never mounted a laser onto his AR-15. On cross-examination, Rigo admitted that he owns a pistol that has a laser on it. When asked if that laser can go through windows, Rigo stated, "I guess I've never tested it. It works the same way as a handheld laser pointer."

[¶11.]     Rigo testified that on May 22, 2024, he got the children ready for school in the morning and took them to the park for "bike-to-school day." Rigo stated that Kylea and I.T. got into a disagreement, so Rigo biked to school with T.T. When Rigo returned, he saw Kylea and I.T. sitting at the park and decided to try "to get [I.T.] to go to school." He told I.T. that he "wanted to give him a hug and try to motivate him to go to school." Rigo testified that "Kylea yelled at [him] and said, *He will not come over*[.]" (Italics in original.) On cross-examination, Rigo admitted that Kylea asked him to leave the park two or three times. Rigo stated that he then put his truck in park, walked around Kylea, and began talking to I.T. Rigo denied charging at Kylea and I.T. during this incident and stated that later that evening

-4-

he attended the children's baseball practice and "stood within 10 feet" of Kylea. Two recordings from this incident were received into evidence.

[¶12.] Rigo testified that he had only hit the boys with a belt once. Rigo explained that when he and Kylea got back together in 2019, "[Kylea] begged and begged [him] to spank the kids." However, Rigo testified that he stopped spanking them because "it was becoming a normal thing[.]" Rigo stated, "It's been years" since he spanked the children.

[¶13.] A text message from United Families was received into evidence, and Rigo explained that "because of the restraining order and the allegation involving guns that they would not take [him] as a client." Rigo stated that as a result, he had not seen his children "for five to six weeks."

[¶14.] During closing statements, Kylea's counsel agreed when the circuit court suggested that any protection order "must be based on the allegations that are in the petition and not anything outside of that[.]" The circuit court elaborated:

> For example, this door incident from ten years ago or more, that's not a matter – I could not find that that would cause a fear of violence or be considered domestic abuse. . . . [W]hat it ultimately comes down to is what's in the petition. It's not – I mean, these other things – and the reason I let the testimony come in was that's background and that's information that led us to where we are today, but it has to be based on the incidents that are alleged in the petition.

[¶15.] The circuit court found that Kylea and Rigo were in a significant romantic relationship and had children together. The circuit court found that Rigo had engaged in domestic abuse through the infliction of fear of imminent physical harm or bodily injury. The circuit court explained:

The facts, excuse me, supporting that are primarily the incident. . . . It was on January 14, where Mr. Tovar arrived and he pointed a gun laser – he pointed a laser through the front window. Ms. Wagner said she couldn't see it, but there was a laser pointed at – I believe the testimony was her son [I.T.] . . . [T]hen it was at her chest and then it was at her forehead. If it's debatable about whether that was threatening conduct or whether that was something that caused her to – reasonably caused her to be in fear, there's other context. There's other context and its incidents that were alleged in the petition in this matter. The incidents were and I find – I find Ms. Wagner to be credible. I find her to be a credible witness and I believe her testimony. She was detailed and she explained exactly what happened and in extensive detail. And because I find her credible, that's why I'm going to issue the protection order in this case. But there were other incidents.

[¶16.] When analyzing the December 30, 2023 incident, the circuit court found:

[Mr. Tovar] had been consuming alcohol. When he was asked about the alcohol during cross-examination, he said, *one shot*. And then he failed to mention the beer, and then he said -- *one beer or six?* And then he said, *One to six*. I find that he was being a little evasive in that answer. But more importantly, it seems that it's undisputed that he did have the AR-15 rifle in his hand out of the safe and I believe . . . Ms. Wagner's testimony that he attached or he was handling a laser sight for that weapon. Be it a Red Dot or whatever other sight, there was something that he was doing with the sight for that weapon. Whether he left with it is really meaningless because this is background information as to what led up to January 14. The Defendant, by his own admission, I believe, handled and carries frequently a handgun that does have a laser sight on it. So I believe it was reasonable for Ms. Wagner to believe that in some way that laser being pointed at her through the window was meant to threaten her, was meant to intimidate her, and it was meant to put her in fear of imminent physical harm or bodily injury. I also find that it was reasonably meant to do the same to the son[.] And I believe that that is sufficient to issue the protection order as to Ms. Wagner and as to both of the children as well. I don't believe that I need to make a finding that the threat was made against all three of them individually in order for all three of them to be eligible or to grant the protection order against them and so I believe that is sufficient.

-6-

(Italics in original.)

[¶17.] As to the credibility of Kylea, the circuit court noted:

> [A]nother thing that I find supports and bolsters Ms. Wagner's testimony is on the incident from May 22, there was a recording there. And I know – I know things can get heated when it comes to domestic affairs, but Ms. Wagner did ask Mr. Tovar to leave a number of times and I just find that that helps bolster her credibility. She was trying to de-escalate the situation and I believe that she has acted in a way that is simply trying to diffuse all conflict in this case. And I believe that a protection order in this case is appropriate for those purposes.

[¶18.] After the circuit court issued its decision, the circuit court and counsel discussed the possibility of supervised visitation at United Families. Kylea's attorney stated:

> My client does want the children to see their father. The United Families' facility is, obviously, monitored and used frequently in situations where supervised parenting time is requested, but I believe Mr. Nooney is correct that their policy is such that they will not allow the facility to be used if there's an allegation of a gun in a petition. I'm not sure how to remedy that, unless the Court in its findings determines that the threat was made based upon a laser and that was sufficient rather than a gun to mitigate the situation with United Families. I -- my client does want the children to see their father as soon as possible.

The circuit court responded:

> [A]s I understand it, the statute allows me to modify this to allow for such things to happen, but for right now we're going to have no custody -- or, I'm sorry, no contact and we're going to have a protection order in place. The faster we can get this taken care of on the custody side or child support side or whatever is all remaining, the faster we'll be able to address these things.

[¶19.] The permanent protection order did not authorize any visitation or contact between Rigo and the children. Rigo subsequently filed a motion to modify

the protection order. At the modification hearing, Rigo asked that the two children be removed from the protection order. Kylea's counsel noted that they had offered supervised visits at United Families and had not received a counteroffer from Rigo. Kylea's counsel represented to the circuit court that "[i]f the concern for Mr. Tovar is that he is losing his bond with his children, my client does not want that, but she does want it to be in a setting." The circuit court responded that "it does seem like your client is amenable to some visitation in some way[.]" Kylea's counsel proposed that Kylea's father supervise the visits, but Rigo stated that he and Kylea's father no longer got along. The circuit court said that it would modify the protection order to allow supervised visitation at United Families, but both parties indicated that United Families would not participate. The circuit court emphasized that it was trying to come up with a solution that would give Rigo time with his children but that it was not comfortable removing the children from the protection order. The circuit court denied the motion to modify the protection order and Rigo appeals.

**Standard of Review**

[¶20.]     "The trial court's decision to grant or deny a protection order is reviewed under the same standard that is 'used to review the grant or denial of an injunction.'" *White v. Bain,* 2008 S.D. 52, ¶ 8, 752 N.W.2d 203, 206 (per curiam) (quoting *Schaefer v. Liechti,* 2006 S.D. 19, ¶ 8, 711 N.W.2d 257, 260). "First, we determine whether 'the trial court's findings of fact were clearly erroneous.'" *Id.* (citation omitted). "If the trial court's findings of fact are not clearly erroneous, we 'must then determine whether the trial court abused its discretion in granting or denying the protection order.'" *Id.* (citation omitted). "An abuse of discretion can

simply be an error of law or it might denote a discretion exercised to an unjustified purpose, against reason and evidence." *Altman v. Rumbolz*, 2002 S.D. 79, ¶ 7, 648 N.W.2d 823, 825 (per curiam) (quoting *Sjomeling v. Stuber*, 2000 S.D. 103, ¶¶ 11–12, 615 N.W.2d 613, 616).

### Decision

***Whether any of the circuit court's findings were clearly erroneous and whether it abused its discretion by entering the Permanent Order for Protection.***

[¶21.]    A "protection order" involving domestic abuse is defined as:

> [A]n order restraining any person in a relationship described in § 25-10-3.1 from committing any act of domestic abuse or an order excluding any person in a relationship described in § 25-10-3.1 from the dwelling or residence of another person in such a relationship, whether or not the dwelling or residence is shared.

SDCL 25-10-1. A domestic abuse protection order may be granted "if the court finds by a preponderance of the evidence that domestic abuse has taken place[.]" SDCL 25-10-5. "Domestic abuse" is defined as "physical harm, bodily injury, or attempts to cause physical harm or bodily injury, or *the infliction of fear of imminent physical harm or bodily injury* when occurring between persons in a relationship described in § 25-10-3.1." SDCL 25-10-1 (emphasis added). A person is in a domestic relationship if they are involved with another person in one of the following ways:

> (1) Spouse or former spouse;
>
> (2) Is in a significant romantic relationship or has been in one during the past twelve months with the abusing party;
>
> (3) Has a child or is expecting a child with the abusing party;
>
> (4) Parent and child, including a relationship by adoption, guardianship, or marriage; or

> (5) Siblings, whether of the whole or half blood, including a relationship through adoption or marriage[.]

SDCL 25-10-3.1. If a person is in a domestic relationship, they are "entitled to apply for a protection order or a temporary protection order pursuant to the provisions of [SDCL chapter 25-10]." *Id.*

[¶22.] Based on its consideration of the testimony, the circuit court found that Kylea and Rigo were in a domestic relationship under SDCL 25-10-3.1 because they had been in a significant romantic relationship in the past twelve months and had children together. The circuit court also found that Rigo had committed domestic abuse and his actions resulted in fear of imminent physical harm or bodily injury.

[¶23.] Based on Kylea's testimony, which the circuit court found credible, it found that on January 14, 2024, Rigo pointed a laser through the front window at one of the children and then at Kylea. The circuit court also found that Rigo owns a handgun that has a laser sight on it. Because of this, the circuit court found that it was reasonable for Kylea to believe that the laser being pointed at her was meant to put her and her children in fear of imminent physical harm or bodily injury. These findings are supported by evidence in the record and are not clearly erroneous. Given the context of the domestic abuse, the circuit court explained that the circumstances warranted a protection order covering Kylea and the children.

[¶24.] Rigo contends that the circuit court abused its discretion by considering remote evidence of domestic abuse. However, "[i]n deciding whether domestic violence is actual or imminent, past abusive behavior is a relevant factor for consideration." *Wolt v. Wolt*, 778 N.W.2d 802, 809 (N.D. 2010) (citation omitted). "Further, '[t]he context and history of the relationship between the parties is also a

relevant factor to consider.'" *Id.* (alteration in original) (citation omitted). The circuit court clearly explained that its protection order was not premised on those remote events but that such evidence assisted it in understanding the context of the parties' relationship. The circuit court did not abuse its discretion when it received testimony regarding remote instances of domestic abuse.

[¶25.] Rigo also argues that it was an abuse of the circuit court's discretion to enter a protection order lasting five years. "Any relief granted by the order for protection shall be for a fixed period and may not exceed five years." SDCL 25-10-5. The circuit court's order was within the limits authorized by statute. Kylea alleged in her petition that she and her children were the victims of domestic abuse. The circuit court heard testimony about the nature of the relationship between Rigo and Kylea and both children, including evidence of physical violence by Rigo directed at I.T. and T.T. After hearing all the evidence, the circuit court found that Rigo's use of the laser through the window resulted in the infliction of fear of imminent harm. Based on these findings, the circuit court did not abuse its discretion when extending the protection order for the full five years allowed by SDCL 25-10-5.

[¶26.] Rigo requested visitation with his children. Kylea agreed that Rigo should have visitation but asked that it be supervised. The circuit court suggested supervised visitation at United Families. Both parties informed the circuit court that United Families would not facilitate visitation between Rigo and the children. The circuit court did not authorize any visitation or contact with the children in its permanent order. The circuit court did not engage in any analysis of whether it was in the best interests of the children that they have no contact or visitation with

their father for the next five years. *See Wasilk v. Wasilk*, 2024 S.D. 79, ¶ 18, 15 N.W.3d 497, 502 (citation omitted) (explaining that "the unremitting principle" in decisions affecting visitation rights "remains the best interests of the child"). Additionally, the circuit court's order was not consistent with Kylea's request that Rigo have supervised visitation with his children. In these circumstances, it was an abuse of discretion for the circuit court to enter an order that it knew would prohibit any contact between Rigo and his children for five years. Based on its remarks at the initial hearing, the circuit court anticipated the opportunity to revise the order to include viable supervised visitation. However, when presented with a motion to modify the protection order and informed at the hearing on that motion that both Kylea and Rigo wanted some form of viable supervised visitation, the circuit court abused its discretion when it failed to modify the protection order consistent with the parties' wishes and the best interests of the children.

## Conclusion

[¶27.] The circuit court was not clearly erroneous when it found that Rigo inflicted fear of imminent physical harm or bodily injury when he pointed a laser at Kylea and one of the children on January 14, 2024 and that this incident constituted domestic abuse under SDCL 25-10-1. The circuit court did not abuse its discretion by entering a five-year protection order that covered Kylea and the two children. The circuit court abused its discretion when it prohibited all contact between Rigo and his children for five years. We remand to the circuit court with direction to conduct such further proceedings as are necessary and to amend the

protection order to provide appropriate contact and visitation between Rigo and the children that is consistent with the best interests of the children.

[¶28.] JENSEN, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.